the United States versus the State of Florida. Mr. Bartos. Good morning, Your Honor. Andy Bartos for the State of Florida. May it please the court. This court should reverse because the district court diluted all three elements of an Olmstead claim transforming them from individualized inquiries into generalized theoretical inquiries and it relied on the erroneous at-risk theory to find that Florida violated the Olmstead rights of thousands of children who do not even live in nursing homes. On that basis the court issued an overly broad injunction that places the district court and a court appointed monitor in de facto control of Florida's administration of services to children with complex medical needs. Can I ask you an overall question, Mr. Bartos, before you launch into your argument? The first argument you make on appeal seems to me at least to be largely legal that the district court in your view, I think using your words, watered down and diluted the three Olmstead requirements. But with regard to that particular argument, argument number one, I didn't understand you to be saying that the district court clearly erred in any of its underlying factual historical determinations. In other words, you argue that under the proper, as I understood your brief, that under the proper Olmstead factors, properly applied, properly interpreted, there was insufficient evidence to show a violation of the ADA. But I didn't see you taking issue with any of the underlying historical factual findings for whatever they may be worth. Did I read your brief correctly on point one? It's a broad question, Your Honor. But the part that where I would qualify that is where the district court under the consideration of the intent of the parents, the will of the parents, wrote that alternatively, even if the standard were as we say it is, then it would still find that parents are overwhelmingly unopposed to moving their children home. And that and that the situation where the reasons that are personal to them are outliers, there we do take issue with the district court's factual finding. And we think the record clearly does not support the position that parents are opposed to moving their children out for personal reasons unrelated to the state of Florida, and that those situations are outliers. I think the record clearly demonstrates that in the overwhelming number of cases that are contained in the record, the parents had their own reasons for placing their children in nursing homes, where a significant number of them place their children into nursing homes because of housing instability or inadequate housing. That has nothing to do with the state of Florida. A number of them place their children into nursing homes because they want their children weaned from medical equipment first. There's a very diverse range of reasons why parents place their children in nursing homes. So the portion of the district court's order that finds that even under the correct standard, we lose, we take issue with that, and we think the court clearly erred there and did not in fact make any factual findings and instead relied on what it considered its perception of the facts. Okay, fair enough. Thank you. So but is it true that the majority of parents whose thoughts were taken into consideration would have wanted their children to be at home, but for the lack of personal duty or private duty nursing, it's just that they didn't have the medical technology or tools necessary for their children to be at home. That is not equivalent to being opposed to having their children. Right, and that is precisely the factual finding that we do take issue with. We think that it's very, very rare when a child actually goes into a nursing home because of insufficient PDN nursing. There was not a single witness who testified that my child is in a nursing home today and I cannot move my child out because the state was unable to arrange private duty nursing services or other services. That person didn't exist. They had ten years to find that person and there wasn't a single witness who testified to that effect, and we think the record clearly shows that that's a very rare case. The court found seven children over the course of ten years who went into nursing homes because of insufficient private duty nursing. That does not establish widespread violations sufficient to support a system-wide injunction. The reason that children go into nursing homes is a broad array of reasons, including housing, weaning children from medical equipment. There were parents whose home was destroyed by a child who lived in the Bahamas. All sorts of reasons, individualized reasons that relate to the families' lives and their circumstances, not in-home nursing. This notion that all of these children, 140 children who live in nursing homes today are there because of inadequate in-home nursing, that is not supported by the record. It's supported by generalizations based on a very small number of discrete cases that the United States put forward. I don't want to jump too far ahead, but just looking at the actual language of the injunction, it does require an individualized assessment nevertheless. So even though it's a system-wide injunction, at the end of the day for purposes of enforcement, it does appear that the district court was requiring the individualized assessment that you're advocating for. It does contain a provision for transition planning on a quarterly basis, but it also is notable that nowhere in the order does the district court identify any child who needs to be moved out of a nursing home. We've waited and waited for that child to be identified, and it's never been identified. And yet at the same time, paradoxically, the district court found that Florida is violating the Olmstead rights of thousands of children, yet we still don't know which child to move out of a nursing home. And that's because of the nature of the evidence presented in this case. It was homogenizing all of these children, 3,000 children, and drawing generalizations from it. And the only way that the United States was able to prove its case with that kind of evidence was the weakening of the Olmstead factors. And the problem with that, the principal problem with that, is that it harms children. The reason that those factors exist, and the reason that the Supreme Court put that into an Olmstead claim, is to protect children. There has to be an alternative setting that is appropriate to that child's needs, and the parents have to be ready and willing to take that child and commit to that child's care. And unless those two factors existed, it endangers the life of the child. And when we weaken those, and we say, okay, those factors can be satisfied if you have an expert who comes in and says, I don't know whether there's actually a place where this child can go, and I don't know whether that place would be appropriate, but based on my review of records, I can conceive of a place where the child can go. That's dangerous, because then you have potential liability on the state, and we don't know where that child is going. If the expert can come in and say, the parents all, they don't oppose nursing, they don't oppose a transfer out of nursing facility placement, because under different circumstances or at a different time, they wouldn't be opposed. That's dangerous, because we have to live in the present world, and we administer systems in the present world. And so if we have to move a child out based on a parent's future aspirations, and that parent is not ready today, that's dangerous for that child. So this is... Do you take issue with the district court's findings slash conclusions that, I mean you, I mean the state, that the state violated its affirmative duties and obligations by not providing alternatives and information, et cetera, to these parents? No, your honor. We provide care coordination. I don't think there is... You take issue with that finding? I'm sorry, that we don't provide information to parents? Yes, we do take issue. And services, because they're different things. Okay, yes. It's one thing to say to a parent, you know, you have private duty nursing services available to you. And then when they say, okay, I want to take advantage of them, sorry, can't give them to you. Right. You've got, the state has some, at some level has an affirmative obligation to provide services, including in this setting, private duty nursing, right? Right. And the district court thought, maybe rightly, maybe wrongly, that the state fell short. That doesn't go to your argument about the Olmstead factors, but do you take issue with the district court's conclusion that Florida failed at some level in doing what it had to do? We don't take issue with the fact that there are gaps in private duty nursing. We don't think it violated the ADA, or for that matter, the Medicaid Act. But we don't take issue with the general conclusion that there are situations where a child doesn't receive all of the authorized hours of private duty nursing. The issue with that is there has to be a showing of causation to prove an Olmstead case. There has to be a showing that that somehow causes institutionalization, because simply not providing services is not an Olmstead violation. It has to be unlawful institutionalization at the end of the day. And there was no showing here that for these 3,000 children who are receiving private duty into a nursing facility, and that causation showing has to be there. And we asked their expert, did you do any assessment to determine whether these children who are receiving private duty nursing are ending up in nursing homes? They didn't do that assessment. In fact, the district court found only seven children over 10 years where that causation existed, where the child, because of insufficient private duty nursing, went into a nursing home. We also don't have causation before that. We don't know why these children aren't utilizing private duty nursing. And oftentimes, that could be for reasons that have nothing to do, that doesn't jeopardize the child's placement in the community. And in fact, we know that there's a significant nursing shortage as well. So simply the fact that private duty nursing is not provided at 100%, which their own expert conceded you would never expect to see, doesn't prove that these children are going into nursing homes. There's a leap there that we think that they didn't prove. I mean, the expert testimony is that 94% of children with medical complexity received fewer PDN hours than they were authorized to receive. That's right, Your Honor. And there's a whole range of reasons that we identify in our brief for that. And not all of those reasons cause institutionalization. And I think they've relied on this assumption that if the child doesn't receive 100% of And that assumption is only an assumption. It wasn't borne out by the evidence. There's no evidence that significant numbers of children are going from the community into nursing homes. It's basically a revolving door between those two populations. That was not borne out. And it could be because there are diverse reasons why those children are not receiving or not utilizing all of their private duty nursing. Often parents will simply decline nursing hours. They'll say, OK, I'm home on a weekend. I don't need the nurse there. I know how to take care of my child. So I don't need the nurse on Saturdays and Sundays when I'm home. So there are all sorts of reasons why that happens. And they didn't examine the reasons, either the reasons for the PDN shortfalls or the reasons why children go into nursing facilities. And they didn't prove that it was because of insufficient PDN. One more question for me. Assume for purposes of the question that you lose with regards to issue number one. In your view, was any sort of injunctive relief appropriate? I think in this in this instance, your honor, no, because because I don't think that they proved widespread violations. And so system wide injunctive relief would not be remember. The assumption is you lose on issue one. If we lose on issue one, I think in other words, the district court did not improperly water down Olmstead. It made the right factual findings, none of which are clearly erroneous. So on the merits of the case, you lose. My question is, is some sort of injunctive relief appropriate? Yeah, I think there's still a need to show redress ability. I don't think there was evidence to show that these specific mandates that are in this injunction would actually redress the violation, which is that there are children unlawfully in nursing homes. And I think that in this situation in particular, we have a significant number of mandates in the injunction that were not even disclosed until after the trial. So they did not prove the reasonableness, necessity or effectiveness of those remedies. We had no opportunity to plead or approve our affirmative defense that those mandates constitute a fundamental alteration of our services and programs. And so certainly this injunction, because of the lack of addressability, the lack of disclosure, which disabled us from being able to prove our case with respect to those accommodations, I think this particular injunction would still have to be vacated. Okay, last question. There's no notice issue with regards to the 90% private duty nursing, right? That was... Notice issue? With regards to the injunction, one of the remedies in the injunction with regard to the 90% of private duty nursing care. Yes, there is a notice issue as to that one.  That was not raised at trial? Never came up at trial. No percentage-based utilization mandate came up at trial. Their expert... No utilization at all at trial about... There was... It's hard for me to believe, given the district court's order. There was never... Their expert never proposed a change to our system that would have required us to hit a particular percentage threshold. Oh, so the problem, in your view, is the lack of a number. The lack of... You knew if they won, they were going to ask for injunctive relief related to the provision of private duty nursing services. Not directly the extent of services provided. What their expert asked for at trial is that we raise our reimbursement rates and that we change our network adequacy standards, various factors that might impact private duty nursing provision. But they never suggested that we have to hit a particular threshold. And then we had no opportunity to demonstrate that 90% or whatever threshold that they were going to propose is infeasible, that other states are also unable to achieve that threshold. There was simply no evidence on a percentage-based threshold at all. They were trying to expand private duty nursing provision by other means, such as rate increases. Can I ask a quick question? Of course. Just to follow up on that, just to make sure I'm right about this. So I understood what the district court's injunction to do was to say, I want you to meet the 90% threshold, but if you can't meet that, you're going to do these other things with the goal of meeting it. So you have an option to try to meet the 90% in some other way, or you do these specific tasks with the objective of meeting it, but you may not. Am I understanding the injunction right? That's not how I read it, Your Honor. I read it to require us to hit 90%, and then it provided optional mechanisms which might or might not help us get to 90%. It said, okay, you don't necessarily have to raise your rates, but you can. You can do that to try to reach 90%, but all of those were means to the end, which is hitting the 90% threshold. And so I do think that I read the injunction to say that we have to hit 90% as to every single child in this universe of approximately 2,750 children. So the way you read the injunction then is you're in violation of the injunction if you don't hit 90%. Yes, Your Honor. And I think that's the argument that we made in our brief regarding unachievability. There's so many different reasons why children do not utilize 100% or even 90% of their hours. It is virtually assured that the state will violate that 90% provision through no fault of its own. But if you say that very few children and their parents take advantage of this private duty nursing option, why will it be impossible for you to comply? Well, there are nearly... If you have a 2%, 3%, 4%, 5% usage rate, you're not going to be paying 90% for 90% of the kids who are institutionalized. Why is that an impossibility in your view? There are approximately 2,750 children who live in the community today who receive in-home nursing. And what the district court ordered is that every single one of those 2,750 children utilize 90% of the hours that they're authorized to utilize. No, he didn't order them to utilize them. It ordered the state to cause that to be delivered, which is the same as... Well, to make it, to make, to offer it. But I didn't read the district court's injunction to require you to provide nurses when parents didn't want it. So that is true. There is an exception, Your Honor, to parents refusing hours. And we can exclude that from the calculation. But not... You have to make them available for 90%. That's right, Your Honor, up to 90%. But again, for all of the reasons we mentioned in our briefing, including a critical nursing shortage nationwide, including all of the diverse reasons why children don't utilize all of their private duty nursing hours, we think it's not just... We think it's not only unattainable, but we think it's almost quixotic to think that it is. To hit 90%, to bat 1,000 on providing 90% of hours to 2,750 children is not something that there was any evidence that any state has ever done. And the other question I have about the injunction is, is there an analysis by the district court of what meeting 90% will do vis-a-vis the risk of a child going into a nursing home? No, Your Honor. And there's no analysis to that effect by the district court. There was no analysis to that effect by Dr. Bachman, the United States expert. We asked her a number of questions about causation. Did you analyze whether your accommodations would have an impact on nursing facility placement, whether it would divert children from nursing facility placement? And keep in mind, Dr. Bachman wasn't even proposing this particular mandate at trial. This mandate, the 90% threshold, we saw for the first time 11 days after trial in the proposed briefing that the United States submitted. It was not proposed by Dr. Bachman. And so there was no evidence at trial regarding the effectiveness of that remedy. You would propose a lower percentage than the 90% or none at all, and the state just does the best it can? None at all based on a percentage, Your Honor. Because remember, they had 10 years to prove their case. They filed this case now 10 and a half years ago in 2013. And they had an obligation to plead their reasonable accommodations. That's one of the elements of their claim. They have to plead it in order for us to be able to assert our affirmative defense of a fundamental alteration. In our answer. So they should have disclosed this in 2013. They didn't do it. We asked them repeatedly in discovery, what accommodations are you seeking? They didn't disclose it. They went to trial. Their expert didn't testify to this. And then they provided it in a post-trial brief 11 days after trial. So the evidence doesn't support it. It was an element of their claim. They didn't prove it. And at this point, the record doesn't support that sort of remedy. All right. Thank you very much. We'll give you your full time for rebuttal. Thank you, Your Honor. Ms. Foster. May it please the court. Sydney Foster for the United States. Your Honor, my friend on the other side's discussion with you, I think makes clear that what Florida is trying to do in this appeal is relitigate the factual issues in the case. Ask this court to revisit them. But it does not come anywhere close to satisfying the demanding clear error standard that is applicable here. I'd like to talk through some of the issues that came up and correct a few misstatements by my friend on the other side along the way. I'd like to start with the issue as to whether or not the parents here were opposed to community placement. My friend on the other side does recognize that the question is whether there was widespread opposition. We explained in our brief that widespread non-opposition can be found if there is a substantial amount of non-opposition or if it's the rule, not the exception. So we don't need to show that all parents want their children home. Where do you get that test from? Where is the idea that you don't need to show that all parents in the class would be unopposed? This derives from the standards applicable to determining whether or not systemic relief is available. So it derives from the Lewis v. Casey standard that says that systemic relief is available so long as there are sufficiently widespread violations. So when we apply that to the non-opposition standard, we need those widespread non-opposition. We cited some cases that have applied that and found that you can get systemic relief and find that there's widespread violations if there's a substantial number of violations. You can do that through a sampling analysis? I'm sorry, what's that? You can do that through what is essentially a sampling analysis? There are a lot of different methods one could use, Your Honor, and sampling is certainly one method. The evidence here, and I'd just like to emphasize my friend on the other side does recognize that the district court did apply the correct standard as part of its alternative holding and recognizes that the clear error standard applies here. And so let's walk through the evidence just briefly because there was some evidence. It was not quantitative analysis, but it was qualitative analysis that was conducted by three expert pediatricians, Dr. Houtrou and two other pediatricians who are also researchers and academics. They did survey 45 of the parents of children who are institutionalized and use qualitative research methods. 45 out of 140? Correct, 45 out of 140. But they determined that actually their analysis represented the views of the group as a whole. So it's different from quantitative analysis in that regard. But for qualitative analysis, what you do when you're trying to figure out, sort of you conduct a number of interviews until you reach a point of, quote unquote, data saturation, which the interviewers here reached at the 21st interview. And that's when they were confident that they had an understanding of the group as a whole. They continued interviewing the parents of 45 children, which only just reinforced their findings. So here we do have evidence about what the group as a whole thought. And Dr. Houtrou was very, very clear that almost all of these parents want their children to come home or go somewhere else in the community. But some of them face some barriers. And significantly, the three major barriers that Dr. Houtrou identified in her study are barriers that are within the control of Florida. The major one, the one that she said was incredibly frequent and incredibly intense, is the private duty nursing barrier. She also talked about two barriers that are related to care coordination. One is the lack of information, sometimes also misinformation from care coordinators about various options and services that are available. And then third is lack of assistance with actually transitioning children out of nursing facilities and into home. And again, that's the purpose of care coordination is to assist in actually obtaining those services. So we have this comprehensive evidence from Dr. Houtrou. But that's not all we have. Contrary to what my friend on the other side says, there was substantial additional evidence. We have testimony by, I believe, parents of eight different children who were either in nursing facilities when they gave their testimony or their children were previously in nursing facilities. All of those parents testified about the barriers that they faced to getting their children home. It was heartbreaking testimony. And all those barriers were within Florida's control. Things like lack of private duty nursing. Things like not even knowing that their children could come home and that they should be asking and getting the support that they needed. Getting misinformation about what their children needed to get home. Say Caden Armour, for example, was told- The state though points to some evidence in the record of parents who did not want their children brought home for different reasons. There were a couple who, at least according- I haven't gone into the trial record, so I'm paraphrasing. Some who were satisfied, at least to some degree, with the care that the child was getting in an institutionalized setting. Some who just, for personal reasons, could not bring the child home. So what do you do with that subset of parents with respect to the system-wide injunctive relief that was granted? So the district court recognized some parents don't want their children to come home for personal reasons that have nothing to do with the state. And the injunction takes that into account. I think this is critical. The injunction does not require any parent who doesn't want their child to go to a nursing facility to transfer their child out. All the injunction does is what Judge Abudu was talking about just a moment ago. It requires Florida to put into place certain services and supports for parents. It does require them to periodically go through a transition planning process with the parents of children in nursing facilities to find out if they would like their children to go home and to help them make that happen, overcome any obstacles that Florida can help them with. Before you move off the evidence, I wanted to ask you about Walmart v. Dukes. So the state argues that there's a problem with using the statistical evidence and the sampling issue under Walmart. What do you say about that? I don't recall them making an argument along those lines, Your Honor. Well, I'll just read it in their brief then. Okay, excellent. So, Your Honor, just going back to the other evidence, the other thing I just want to point to about the factual contentions is if one actually digs into a lot of the asserted facts that Florida cites for the proposition that a lot of parents have their own reasons outside of the control of Florida for wanting their kids in nursing facilities, a lot of those fall apart completely when you actually look at the record evidence. So I would urge this court to actually look at those documents. For example, just one example, a lot of Florida's claims come from the testimony of two officials of the nursing facilities who went through child by child and gave a snapshot of what was going on with that child. We explained already in our brief one reason why that is less reliable than the evidence from Dr. Houtrow and her colleagues. But I'd urge the court, there are other reasons that that's not reliable too. If you actually look at that testimony, it in large part actually supports the United States' views. One of those officials, Brenda Legg, testified that three of those children were in nursing facilities as a direct result of the lack of private duty nursing. Obviously, those are unopposed. The other official, Kelsey August, testified that 11 children were either in the process of transitioning their children home or had already had just done it. Another seven had started that process or expressed interest in that process, but it was halted for some reason. With respect to the remaining children, almost all of the descriptions by these officials actually give no information about what the barriers are. Sometimes the officials say that the parents aren't interested in bringing the child home, but they usually don't give enough information for us to assess whether or not that's something that Florida could do something about. And just one other example is that Florida will just cherry pick particular statements within the record. Here is just one example where Florida claims in its brief that one child is in the nursing facility because his parents are incarcerated. If you actually go and look at the support for that statement, all it is is a statement by the nursing facility official that, indeed, that child's parents were recently incarcerated. But the official then explains that the child has a guardian, an aunt, and there's no to start the transition process and so forth. So we really just have no information. So a lot of these examples just fall apart on their own. They certainly are not enough to show that the district court clearly erred in finding that district court found that overall parents are unopposed, which is, of course, a standard that the district court applied. But the real question is whether a substantial number of parents were unopposed so as to justify the equitable relief here. One of the questions I asked the other side was whether there was evidence about the degree of risk that was being minimized by the district court's injunction. So you're pursuing this claim based on the idea that the state of Florida is creating a substantial risk of moving people into nursing homes that should not be in nursing homes. And then the district court said, I agree with that. And then it entered this injunction. How much risk is being minimized by the injunction? So the district court found that the 90 percent mandate will go a long way, I think, is the words that the district court used to reducing the risk of institutionalization. I think that makes sense in light of the record. Keep in mind that the private duty nursing services here are life-saving services that these children need in order to stay alive. So if private duty nurses are not providing these services, then someone needs to come and cover. It's usually a parent, sometimes another family member. But someone needs to do it. It's not the kind of service that you can just go without. So given that, and we explain in our brief about how the families in these cases, they're all poor. They're eligible for Medicaid. Many have single parents and so forth. They're living on the edge. And so at any moment, those parents could become sick, injured, and have to deal with health care issues with family members. They often need to work just to be able to maintain their house. There are all kinds of things that could come up that could prevent them. Florida isn't doing that, though. What's that? Florida isn't making them unemployed or whatever would cause that. So the degree of risk that we're trying to minimize here is Florida isn't allowed to exclude people from the service and could have an Olmstead violation. So how does the district court's injunction minimize the degree of risk to now make what Florida is doing legal as opposed to illegal? Well, it minimizes it because your honor. Well, first of all, I would just actually take issue with one kind of premise of your question, which is that the fact that these parents are taking heroic measures to fill in the gaps for what Florida, the services Florida should be providing, that actually should not somehow relieve Florida of liability. Oh, no, I guess my point was just you were talking about having housing problems and things like that. I mean, that's not no injunction is going to eliminate that risk and against Florida, right? Uh, your honor, I disagree. The housing issues that I was just talking about are exactly the kind of issues that could be prevented if Florida implements the services. So with more nursing, there'll be better housing for the people. I mean, I'm confused. Yes. So let me just give you an example, your honor. I mean, there are a couple examples that what happens often with these parents, it's heartbreaking stories of these parents who are taking heroic measures to cover the gaps in private duty nursing. They're often like Eve Harris, who's the parent of Jeffrey. They often have to miss work in order to take care of their children. Eve Harris sometimes tried to bring her son to work and to the extent that she could. You know, we have other testimonies like Julie Pagano. She had to lose her job as a realtor because she was not getting Saturday service as she was promised by Florida. So the individuals can lose their jobs. There's plenty of evidence in the record of losing their jobs, in which case they can then lose their housing. And then, you know, it's just I think one parent described this as a domino effect. You know, the lack of private duty nursing just has all of these negative consequences. So I get your point now. Yeah. So just back to my initial question, how much risk is reduced by the district court's injunction? So the district court found it went a long way. I think we would say you can join the state insofar as it goes a long way to reducing the risk of improper institutionalization. Well, the district court's exercising its discretion in crafting an appropriate remedy. We think that the 90 percent figure is an appropriate remedy, an appropriate place to try the thing. I mean, and that's this goes to just sort of the overall like overall sort of theory that you're pursuing. The district court clearly had discretion to remedy a legal violation, right? But a district court doesn't have discretion to just do stuff if it doesn't remedy a legal violation. And it doesn't have discretion to go beyond what would be necessary to remedy a legal violation. And so my question is, how do we know that what the district court did is going to remedy the violation? And how do we know that it didn't go beyond the violation if it's just substantial risk that we're talking about? Yeah. So I guess I would say two things. Number one, just taking just a slight issue with the premise, which is that the district court has authority not only to remedy the violation, but also to prevent future violations if there is a cognizable risk of future injury. That follows, that's like bedrock principle of, and in fact, is an alternative basis on which this question. I would say that's the same thing. Remedying a past violation versus preventing a future violation is the same thing. So I agree with that reformulation. OK. OK, excellent. So then the question is, was it an appropriate exercise of the district court's discretion to order the 90% figure here? And we think the district court very appropriately drew the line there. It's not going to be perfect. It's not going to prevent all future unnecessary institutionalization. Because some kids are getting 24-hour, seven days a week private duty nursing. So actually, a 10% gap there could be the difference between being institutionalized and not. But it's going to largely address all of the problems here. And again, keep in mind, this is the life-saving treatment that is required. So if the nurses are not providing it, parents have to step in and do it. There's plenty of evidence in the record about the heartbreaking tales of what the parents were doing to kind of cover these gaps. A little bit broader again. Could you address the Fifth Circuit's opinion in the United States versus Mississippi? Yeah. So the Fifth Circuit rejected a claim there that the United States had brought contending that certain individuals with serious mental illness were at serious risk of unnecessary institutionalization. This court does not need to worry about the Mississippi decision because it expressly distinguished circumstances that are present here and said it wasn't deciding whether or not a serious risk claim would be viable under the circumstances like those here. Six other circuits have held that. What are the circumstances? I'm just curious. What are the circumstances? So the Fifth Circuit explained that in the six other circuits that have recognized a serious risk claim, that it was not deciding whether or not those decisions were correct. It explained that in those situations, the serious risk claim concerned things like lack of medically necessary items, a lack of access to personal care services. It cited, for example, Ratasiewski, a Seventh Circuit case which concerned the denial of private duty nursing. The Fifth Circuit said that category of cases, those might be different. They might be kind of subject to generalization in a way that in the Fifth Circuit's view, cases concerning individuals with serious mental illness are not. And the court expressly decided it wasn't going to decide whether or not there's a serious risk claim that's viable there. Again, I want to emphasize, too, that this court does not, you know, I'm happy to talk through sort of why a serious risk claim is viable under the ADA. It follows directly from both the regulation and the statute. But also, this court doesn't even need to decide that because of the equitable principles that we were just talking about. A court has the authority not only to prevent discrimination but also, or sorry, to remedy current discrimination but to prevent future discrimination. So even if you don't think a serious risk claim is viable under the statute, a court can still order relief meant to prevent future unnecessary institutionalization. That would require, just to play that out, because would that not require us to say that district court identified past violations, past Olmstead violations? Yes, that's right. So the court could look at the group of institutionalized children. If the court wanted to go this route and not decide whether a serious risk claim is viable, the court could look just at the group of institutionalized children, find that there were violations with respect to them, and then enter the exact same relief it entered here on the basis that it is remedying the discrimination against those institutionalized against the same group of children. Is that what the district court did? The district court understood that there was a serious risk claim here, so it proceeded under the serious risk theory, but it would be the very same analysis, and I don't take my friend on the other side to take any issue with our point that there could be an affirmance on that alternative ground if this court so desired. I just have two questions. One is a follow-up in terms of if we just look at the number of children who are institutionalized, what is the number of folks who fit into that category? And my second question is an ask that you please address the state's argument that they didn't receive any notice as to the remedy that was actually going to be imposed against them. Sure. So there are currently around 140 children who are in the three nursing facilities that are across Florida, in answer to your first question. In answer to the second question, there was ample notice here. The state is focusing on the 90% private duty nursing remedy. We provided notice in multiple documents throughout the course of the case, starting when the case was revived after the remand from this court. During discovery, we produced the report of Dr. Bachman, where she explained that she understands the Medicaid Act to require the provision of all medically necessary private duty nursing. That's on pages four through six of her expert report. And then she went on to say that Florida should expand access to private duty nursing in order to comply with the Medicaid statute. And she then provided several options for Florida to do so. So it was very clear. One of their points or one of their arguments is that they were never told before your post submission about the 90% rate and that that would have impacted them because had they known the rate was that high, they would have tried to make a substantial alteration argument as some sort of an affirmative defense and they were precluded from doing so. In other words, had you proposed a 60%, maybe that's not something they could have legitimately argued. But when you went up to 90, they were deprived of the right to argue that this was a substantial alteration and argue that as a defense against system-wide injunctive relief. Yes. What's the response? So the response is that we were very clear from the get-go that what we were seeking was expanding access in compliance with the Medicaid Act, which we understand to require 100% provision. Dr. Bachman said in her report, that's how she understands it. So we were saying they should expand access to 100% using these methods. Now, when we briefed the remedies, we asked for something less than 100%, but they can hardly complain that they didn't have notice of the 90% figure when it was very clear from the get-go that we were asking for them to provide up to 100%. And as a district court explained in denying the stay, that private duty nursing, the lack of it, that was the cornerstone of this case. And I think if you look at the record, it's obvious that it was. If Florida felt that it was going to be a fundamental alteration to significantly increase the access to private duty nursing, it had ample opportunity to do so as the district court found. OK. Thank you very much. Thank you very much. Thank you. I'd like to start with what we haven't heard, which is, again, we still don't know which one child living in nursing facilities today needs to be moved out. And I think that's a fundamental failing that has to be kept at the forefront. That's not the end-all, be-all. It may go to the extent of the injunctive relief provided. But if you're dealing with a serious risk of harm claim, it's not only kids who are currently at home, but if they don't get the services, are going to be institutionalized. Am I wrong about characterizing it that way? I'm sorry. And I think there are a couple of answers to that. One is, if they can't name a single person in a nursing facility who's stuck and who can't get out because of something Florida is failing to do, then I hardly think that they can prove an Olmstead claim by pointing to people who don't even live in nursing facilities. But we also think that, in addition, the Fifth Circuit was right in U.S. versus Mississippi. This notion that the ADA prohibits a risk of harm and that a risk of harm itself is cognizable, I think, number one, the statute doesn't say that anywhere. The regulations don't say that. They rely solely on their own statement, which didn't go through notice and comment rule making. They put it on the internet. Other courts have cited that, but purely out of deference. They haven't pointed to the statutory or regulatory provision that supports this at-risk theory. And if Congress can make a risk of an occurrence a cognizable harm, then they can always circumvent Article 3. But why isn't risk of harm, even if you're right about that, why isn't risk of harm a proper consideration in crafting injunctive relief, assuming a violation? Well, the violation then would have to be elsewhere. The only thing that we know about the children who live in the community is what percentage of nursing services they actually utilize. That's it. There's a barren record as to them. And so to construct this violation based on children who are not living in nursing facilities and about whom we know nothing in the record, I think that goes way too far. There was no testimony about parents who lacked adequate private duty nursing services? That's right, Your Honor. But that doesn't show that they were facing what Lujan requires, an imminent risk of harm, which in this circumstance is unlawful institutionalization. In the institutionalization setting? I'm sorry? What does imminency mean in the institutionalizing, that if you don't get services the next day, the child's going to be institutionalized or that if you don't get nursing services over the course of the next month, there's a serious risk of institutionalization? I think it could be a number of different ways to prove that. But the way that it can't be proven is simply looking on a spreadsheet and saying, this is the average percentage of nursing that each child out of 3,000 utilized. Let me ask a similar question. This was tried with serious risk, right? That was the theory of the case. So was there any finding by the district court that there's actually an Olmstead violation with respect to these specific people and then I'm going to provide systematic relief in light of my findings about Olmstead violations? Not as to specific people, Your Honor. The United States always homogenized this class. They always aggregated these children, 3,000 children, basically into one and said they received 70% to 80% of their PDN. Therefore, they live at the brink of nursing facility placement. Well, that's an assumption. That's pure speculation. And the only thing we know about that class of children is that percentage. They rely on eight parents who testified at trial. That's out of 3,000. Eight out of 3,000. And then they generalized from those eight, whom they hand-selected, and they generalized to 3,000 and they want us to assume. How many would have been required on an evidentiary sufficiency basis out of 3,000 for the district court to have had a robust enough record to make findings and inferences out of 3,000? I don't know how many would be required or what kind of evidence would be required, but I think the fact that the . . . If they put on 25, would you be still making the same argument? Yes, 25 out of 3,000. But they also could have put on . . . 50. They could have put on . . . 50? I would make the same argument, Your Honor. 100? I don't know where that line is, Your Honor. That's the difficulty then, because in a case where you've got a lot of individuals who are in the group, you're never going to be able to provide testimony from all of them, right? And I don't know whether this district court's findings here were sufficient or not. I've got to dive into the huge record and figure that out. But it seems to me that saying that eight witnesses plus expert testimony is insufficient leaves me asking, what . . . How many witnesses do you need? So I think the . . . On expert testimony, and I think it's not just the number, but the nature of the evidence. So the only thing we know about these 2,800 children who don't live in nursing homes is the percentage of PDN that they utilized. That's it. The experts did not testify about whether . . . They did not provide any sort of evidence that that percentage of service utilization puts them at risk of nursing facility placement. I asked Dr. Cezanne whether she performed that analysis. She was their statistical expert. And I asked her, did you assess whether these children who were in your sample, thousands of children, ended up in nursing facilities? No, she didn't. How many of them ended up? She didn't know that. So it's not just the number, but if they're going to provide evidence based on spreadsheets or aggregate evidence, it has to be something more than the percentage. Because otherwise, what you are saying is, if a state provides 70 to 80 percent of PDN services, that equals an Olmstead violation. It violates the ADA if you're at 70 percent. We're putting a numerical threshold on ADA violations. Because that's all we know about these children, apart from the evidence that they selected from eight children, which I think doesn't get them to where they need to go. But you told me earlier on that there was no dispute that the state wasn't providing PDN services as required, for a lot of reasons. But you thought that that wasn't an issue that was disputed. So there are situations where less than all of the authorized hours are provided. I don't mean to suggest that we violated any requirement. The Medicaid Act, they talk about the Medicaid Act requiring 100 percent service provision. It does not. It has an access provision that says Medicaid will provide the same level of access that the general population in the same geographic area enjoys. We know that there's a significant nursing shortage, not only in Florida, but nationwide. So even the Medicaid Act, and we're not here under the Medicaid Act, but even that doesn't require 100 percent service utilization. So while it's true that fewer than all authorized hours were provided, that does not equal either an ADA violation, because there's no evidence that that creates some sort of imminent risk of nursing facility placement for a significant number of children, or that it's a Medicaid Act violation, because they didn't put on any evidence that the general population has a higher rate of access to nursing services. Can I ask my final question? So the government distinguished the Mississippi case. And I just want your response to the effort to distinguish that case. Right. So the Mississippi case, I think, is very clear that the ADA does not countenance this at-risk theory. I think they were very clear. They went through the text of the statute. They went through the text of the regulation. They talked about deference, and why, especially under the Kaiser case, deference is not due. They did have one paragraph after that where they say, and by the way, the facts of this case are different from those in the other circuits. But that was not the essence of that court's holding. What the court held in U.S. versus Mississippi is that a risk of institutionalization by itself is not discrimination under Title II of the ADA. And we don't think that one paragraph which says, and by the way, this case is different from those in the other circuits, limits that holding. The holding, we think, is very clear. The analysis is very clear that there's no basis for this at-risk theory in the text of the statute or the regulation. And what those other circuits did, they never cited the statute. They never cited the regulation. They relied solely on deference in a pre-Kaiser world. But the risk here is not, so for example, one of the pieces of evidence that was introduced was on behalf of a family whose daughter needs a breathing device in order to survive. The mother didn't know how to administer that breathing device, which means that if her daughter didn't have or child didn't have the nursing care necessary, that child would die unless that child is placed in an institution. First, that doesn't seem to be a unique situation just to that family. So even though you had one parent who testified to that, that is a scenario that is shared by many families. How is that simply just a risk that's a hypothetical as opposed to if that parent doesn't have that service, their child will either die or need to be institutionalized? And under our theory, that parent might well have an Olmstead claim because, again, our view is the Article III standard of imminent threat of injury governs. And so that parent, based on those facts, might be able to demonstrate an imminent threat of injury. The difference here is that they're trying to lower that standard. Again, just like the elements of Olmstead, they're trying to lower basically the standing standard. They want to be able to demonstrate a future injury based simply on this nebulous risk that we have 3,000 children, we know they're not using all of their authorized hours, we'll assume that they're at risk of nursing facility placement, and so we get an injunction. That parent that you described, we have facts there. That parent might well be able to demonstrate under Lujan that they have Article III standing because there's an imminent threat of unlawful institutionalization in that case. Of course, it depends on the facts. But I don't think that we can generalize from that situation to the entire universe. It's simple. There's simply no evidence to suggest that every one of the 3,000 children is in that scenario, is in that situation. That's a unique situation. That situation might well meet the Lujan standard. We're not saying future injuries are not redressable, but it has to be done under the Lujan standard of imminent risk. And under that standard, we don't think they have proven their case because all they have are seven spreadsheets showing the percentage of authorized services that were utilized. That's not an ADA violation. We don't think that establishes an imminent risk of unlawful institutionalization. All right, Mr. Bartels, thank you very much. Ms. Foster, thank you very much.  Thank you, Your Honor.